Filed 4/8/25  P. v. Rodriguez CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B332409 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA108179) |
| v. | |
| DAVID RODRIGUEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Darrell S. Mavis, Judge. Affirmed.

California Appellate Project, Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Supervising Deputy Attorney General, Nikhil Cooper, Deputy Attorney General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Appellant David Rodriguez opened fire at his former friend and business partner, who was standing in a crowd at a taco stand. Rodriguez fired five shots, hitting his former friend with two, killing him, and injuring a 10-year-old bystander who was there with his family. Rodriguez was convicted by a jury of first degree murder in violation of Penal Code section 187, subdivision (a)[1] (count 1), and assault with a firearm in violation of section 245, subdivision (a)(2) (count 2) as the lesser related offense to attempted murder, of which he was acquitted. The jury also found true as to the murder count firearm enhancements as set out at section 12022.53, subdivisions (b), (c), and (d) and section 12022.5, subdivision (a) (section 12022.5(a)), and this same latter enhancement as to the assault count.

Rodriguez was sentenced to an indeterminate term of 25 years to life on count 1, plus 25 years to life for the section 12022.53, subdivision (d) (section 12022.53(d)) enhancement with punishment for the other enhancements on count 1, stayed, for a term on count 1 of 50 years to life. On count 2, he was sentenced to the midterm of three years, plus the midterm of four years for the gun enhancement, consecutive, for a term of seven years, with a total term for both counts of 57 years to life.

---

[1]     Further unspecified statutory references are to the Penal Code.

On appeal, Rodriguez challenges the sufficiency of the evidence of his willfulness, premeditation, and deliberation on the murder count; the trial court's sentence of 25 years to life on the firearm enhancement as to that count; the court's midterm sentence on the conviction for assault with a firearm; its denial of his request to strike the gun-use enhancement as to the assault count; and the court's denial of his request to strike all the gun enhancements on the basis, rooted in equal protection, that their prosecution here deprived him of the benefit of the then District Attorney's special directive against prosecution for enhancements (Special Directive 20-08) on top of substantive counts.

We reject these claims, or find them forfeited, and affirm the judgment.

## STATEMENT OF THE CASE

I.    **Facts**[2]

A.    **Background and Context**

In May 2020, Rodriguez, then 20 years old, and Liana Mkrtchyan had been friends since around the seventh grade. They had lived near each other in their childhood neighborhood, each with their respective families. In 2020, Mkrtchyan lived with her family in Van Nuys while Rodriguez lived with his mother and brother in Glendale. At that time, their friendship had been recently renewed once Mkrtchyan had broken up with a boyfriend who had restricted her social contacts. In 2020, Rodriguez and Mkrtchyan as close friends communicated regularly by text message and saw each other frequently.

---

[2]    We take the facts from the trial testimony and other evidence presented at trial.

Both Rodriguez and Mkrtchyan also knew brothers Teodik and Tadeh Atanes through school and mutual friends.[3] Rodriguez and Teodik (or "Teo") were close friends for a period of years, a fact known by Mkrtchyan in 2020, and Teodik at one earlier point lived with Rodriguez. But when the friendship between Rodriguez and Mkrtchyan was renewed in 2020, Mkrtchyan observed that Teodik was not around, though she did not discuss this with Rodriguez.

According to Jose Guerrero, another longtime friend or acquaintance of Rodriguez, Teodik and Rodriguez together had conducted a marijuana delivery business for some months in 2017 or 2018 before it failed, and they also bought a car together and shared it.[4] As a result of financial or other issues related to these endeavors, the relationship between Rodriguez and Teodik became strained. According to Guerrero, the two were always arguing and eventually they stopped hanging out together. Rodriguez had told Guerrero at some point that Teodik's reckless spending was the reason for the marijuana business failure.

### B.    The Events of May 20, 2020

Mkrtchyan engaged in a daily text-message exchange with her mother, constantly informing her mother of her whereabouts, company, and plans. On May 20, 2020, around 5:05 p.m., as she was leaving her home in Van Nuys for Glendale, Mkrtchyan

---

[3]    Because the Atanes brothers share a surname, for clarity we refer to them by their first names and mean no disrespect in doing so.

[4]    Guerrero testified at trial for the People under a subpoena. He was largely not forthcoming in his testimony and an earlier police interview that had been videotaped was played for the jury, with corresponding transcripts, to impeach his testimony.

4

texted her mother and told her she was going to pick up Rodriguez and get "Boba," a type of tea drink. On the way, Mkrtchyan dropped off her sister at their cousin's place in Glendale.

Mkrtchyan texted Rodriguez on the way to his house to let him know she was coming. He texted her back. Upon her arrival at his house around 6:00 p.m., she texted him again to let him know she was there. Rodriguez left his house and got into her car, a black Volkswagen, and the two drove to Boba Loca in Glendale, where Mkrtchyan bought an item for herself. They went on to the nearby Panda Express, where Mkrtchyan bought some take-out food for herself.

At around 7:02 p.m., Mkrtchyan and Rodriguez drove in her car to Glassell Park to meet up with friends, including Rodriguez's brother Daniel and Guerrero, and watch them play soccer. Rodriguez got some ice cream and he and Mkrtchyan sat and ate their food in the bleachers. While at the park, Guerrero asked Rodriguez about the visible "print" of a gun in his pocket, and Rodriguez admitted he had a gun. According to Guerrero, Rodriguez "always" kept "his guns on him." At 8:46 p.m., Mkrtchyan texted her mother and told her she and Rodriguez were going from Glassell Park back to Rodriguez's house in Glendale. Her mother texted back, telling Mkrtchyan to go home.

Mkrtchyan and Rodriguez were traveling in her car past the location of the El Sauz taco stand on San Fernando Road in Glendale at 8:59 p.m. when Rodriguez suddenly leaned forward in the passenger seat, looked out the window toward the taco stand, and told Mkrtchyan to pull over. She quickly steered left and parked her car at the curb near Glendale Auto Body. Rodriguez told her he was going to El Sauz and would be right

back, and he got out of the car. Mkrtchyan assumed he was going to get food at El Sauz as all he had eaten was ice cream earlier at Glassell Park. After Rodriguez got out of the car, Mkrtchyan texted her mother to tell her she would be heading home soon. A moment later, around 9:00 p.m., Mkrtchyan heard five gunshots and people yelling. Fearful, she started to drive away.

Meanwhile, just before 9:00 p.m., brothers Tadeh and Teodek Atanes were on their way to pick up their mother from work at Old Gyumri Restaurant on San Fernando Road in Glendale, located across the street from the El Sauz taco stand. When they arrived at 8:58 p.m., Tadeh parked on the street and Teodik walked across the street to get tacos at El Sauz. As Teodik stood in line at the taco stand, Rodriguez crossed the street and fired five 9-millimeter shots from a handgun in Teodik's direction. Teodik was hit by two bullets, one of which entered and exited his body, causing massive damage to his lungs, heart, and aorta. He attempted to cross the street but slumped into the street and fell to the ground. When the shots were fired, people standing around the taco stand quickly began to disburse.

Ten-year-old Hamlet P., who was at the taco stand with family members and who had been at the counter to get the key to the restroom, heard what he initially thought were fireworks and he saw people running, so he ran too. He ran to the back of the taco stand to join his family but was hit in his arm. When he joined his father and uncle, he noticed he had blood on his jacket. When his uncle took him to the car, he noticed the blood on his left arm, just below the elbow, although he hadn't realized he'd been hit. He was taken to the hospital where a bullet was removed from his arm.

While sitting in his parked car, Tadeh did not see Teodik get shot but he heard the shots fired and then he saw his brother fall in the street. He went to him, saw that Teodik was covered in blood and nearly unconscious and that he couldn't breathe. Tadeh called 911, telling the operator that Teodik had been "shot [i]n his chest" and "on his side." The audio of the call was played for the jury.

When Mkrtchyan was starting to drive away after hearing the shots and people yelling, Rodriguez suddenly "zoomed back in" her car, and urged her to drive on. She did but at first neglected to turn on her headlights as she was "confused," "worried," and "not sure what was happening." According to Mkrtchyan, when Rodriguez got back in her car, he was "happy, excited," exclaiming: "I got him. I fucking got him. I said I was going to get him, and I did" and "This fucking guy didn't even see it coming. I even told him I'm going to get him." Rodriguez was talking about Teodik. When he said this, Mkrtchyan saw Rodriguez put his hand on top of a weapon, slide his hand in an upward motion, and "pop[]" a bullet casing out into the car. Mkrtchyan had seen Rodriguez with a gun on one prior occasion. Rodriguez then made a few phone calls while they were driving to tell others what he had just done. Mkrtchyan heard him say that he had "got Teo" after seeing "him randomly, like it was on the spot, like wrong-place-wrong-time type of thing."

Mkrtchyan drove toward the Shake Shack in Glendale to drop Rodriguez off where his brother worked but she soon realized that she was driving without her headlights on, and she activated them, as can be seen on surveillance video played for the jury. She tried to act normally towards Rodriguez because she

7

was afraid and did not want him to think something was wrong or that she was "turning" on him.

At 9:15 p.m., Mkrtchyan dropped Rodriguez off at the Shake Shack. Guerrero was there, along with Rodriguez's brother Daniel and another person. Rodriguez told Guerrero he had seen Teodik at the taco stand, hopped out of the car, shot at him five times, and thought he had hit him. Rodriguez also said he had been looking for Teodik and shot him. Guerrero saw Rodriguez sitting in his brother's car that night with a black gun on the seat next to him. He also saw Rodriguez put a black gun into his pants' pocket.

After Rodriguez returned home that night, he communicated with Mkrtchyan, telling her not to talk about what had happened. They played a game together over the internet, as they had planned earlier. Mkrtchyan maintained contact with Rodriguez after May 20, 2020, because she was afraid. At one point some days or a week after the crime, Rodriguez told her that Teodik had stolen money or "weed" from him, that they weren't friends anymore, and that he had sold the gun he had used on May 20, 2020, and had thrown away the clothing he was wearing that night. He also said he had previously told Teodik, "Next time I see you I'm going to get you."

Teodik likely died instantly due to the grievous nature of his gunshot wounds, one of which would have been "very rapidly fatal." After unsuccessful CPR efforts at the scene, he was taken by ambulance to a hospital. An autopsy was later done that confirmed his injuries and cause of death—gunshot to the torso with a gunshot wound to the left upper back as a contributing condition. The manner of death was homicide.

### C.     The Investigation

Law enforcement searched and processed the crime scene that night. There was "a large pool of blood" in the street. Located in the crosswalk was a brass bullet and two 9-millimeter brass casings—one branded "G.F.L" and the other branded "W.I.N," as in Winchester. By the sidewalk in front of the taco stand were three 9-millimeter "Wolf" branded steel casings and a portion of a bullet. Near the front of the taco stand was blood spatter, a trash can with a bullet hole, and two bullet fragments. A total of five casings were found at the scene—all 9-millimeter though of different brands.

Law enforcement retrieved data by search warrant from cell phones used by Mkrtchyan and Rodriguez and used cell phone tower tracking data to piece together and track the locations of these phones, and by extension them, on May 20, 2020. Mkrtchyan's phone left her home in Van Nuys around 5:05 p.m.; it arrived near Rodriguez's home in Glendale around 6:00 p.m.; both phones were located together at Glassell Park and then travelled to the taco stand at around 8:59 p.m. and left at 9:01 p.m. This evidence was presented at trial and the path and routes of the phones were consistent with Mkrtchyan's testimony about where she and Rodriguez had been that night and when.

Law enforcement also assembled a compilation of surveillance video footage taken from locations around El Sauz.[5] This footage was also consistent with Mkrtchyan's trial testimony and was presented to the jury at trial. As explained through trial testimony, the footage showed Mkrtchyan's black Volkswagen

---

[5]     The timestamped footage was slightly off and the jury was told to not consider the timestamp for the actual time of events shown.

9

pull up just before 9:00 p.m., Hamlet P. at the taco stand, and a figure raise an outstretched hand and fire a gun, and Mkrtchyan's car leave the scene, at first without headlights on. Additional surveillance video footage taken from near the Shake Shack captured Mkrtchyan's car in the parking lot there shortly after the crime, at 9:14 p.m. The footage was also consistent with her trial testimony.

Both Rodriguez and Mkrtchyan were arrested and charged with murder and attempted murder on July 9, 2020. Rodriguez's home was also searched. Located there under a mattress was a box of Wolf-branded, steel-cased 9-millimeter ammunition that matched the Wolf casings found at the crime scene. Rodriguez was stopped that day by police while driving, and he was arrested. His car was impounded and a phone was located under the driver's seat. Three photos of firearms were located on the phone when it was searched.

Mkrtchyan was also stopped by police on July 9, 2020, while driving with her mother and sister. Officers questioned her about the events of May 20, 2020. She did not tell them everything because she was "terrified." They asked her to come to the police station, which she did after making contact with a family member who was an attorney. Mkrtchyan did not then admit that she had been at the shooting scene, instead implying she had only learned about the shooting later. She also then told police she had attended a family gathering on May 20, 2020, which was not true as she had only dropped off her sister there on the way to pick up Rodriguez.[6] At the police station, police took

---

[6] These inconsistencies in her trial testimony were brought out on cross-examination.

Mkrtchyan's phone. She was arrested and charged that same day and posted bail 22 days later.

On July 12, 2020, officers went to Guerrero's home and he later went to the police station where his interview was recorded. He then told police that Rodriguez and Teodik ran a marijuana delivery business together for a few months in 2017 or 2018 and that they shared a car and were always arguing over these issues.

On October 21, 2021, Mkrtchyan went to the Glendale police station with an attorney. She signed a "proffer agreement" in which she agreed to testify truthfully about the events of May 20, 2020. In November 2021, Mkrtchyan entered into a plea agreement under which she pled to a charge of being an accessory after the fact (§ 32) and was placed on probation, a violation of which would result in prison time. The murder and attempted murder charges remained pending against her at the time of Rodriguez's trial.

## II. Procedural Background

On November 13, 2022, Rodriguez was charged by amended information in count 1 with the willful, deliberate, and premeditated murder of Teodik Atanes, in violation of section 187, subdivision (a), with firearm enhancement allegations under section 12022.53, subdivisions (b), (c), and (d) and section 12022.5(a), and in count 2 with the attempted willful, deliberate, and premeditated murder of Hamlet P., in violation of sections 664/187, subdivision (a), with a firearm-use enhancement under section 12022.5(a). The following aggravating factors were also alleged in the pleading: (1) the crimes involved great violence, great bodily injury, and the threat of great bodily injury (Cal. Rules of Court, rule 4.421(a)(1)); (2) the defendant was armed

with or used a weapon (Cal. Rules of Court, rule 4.421(a)(2)); and (3) the defendant engaged in violent conduct by firing a handgun five times into a crowd, indicating a serious danger to society (Cal. Rules of Court, rule 4.421(b)).

A jury trial was conducted in May 2023. After the People rested their case, Rodriguez moved for acquittal under section 1118.1 of the attempted murder charge in count 2, which was presented at trial under the "kill zone" theory. His motion also sought to strike the firearm enhancements on both counts based on the then District Attorney's Special Directive 20-08, on the asserted basis of an undeveloped equal protection violation. The prosecutor responded that section 12022.53 was "valid law in California," that Rodriguez had been held to answer at preliminary hearing, and that "whatever discretion the District Attorney in a particular county may or may not have has no bearing on the laws of the State of California and what a court has found probable cause for at a prior hearing. And so there's no basis to dismiss that allegation." The trial court denied the motion, indicating that "the policy decisions of the District Attorney's office, that is, of course, not law of the case and not law for the court to follow … in terms of taking any action regarding this case."

Rodriguez was convicted of first degree murder in count 1, with the alleged firearm enhancements for personal use and the intentional discharge of a handgun causing death found true. (§ 12022.53, subds. (b), (c) & (d); § 12022.5(a).) He was acquitted of attempted first degree murder in count 2 but found guilty of the lesser related crime of assault with a firearm in violation of section 245, subdivision (a)(2). The jury found true with respect

to count 2 that Rodriguez had personally used a handgun.[7] (§ 12022.5(a).)

Before sentencing, Rodriguez filed a sentencing memorandum in which he requested that all the firearm enhancement allegations be stricken, and he re-asserted a violation of equal protection in that he, unlike others later charged, did not receive the benefit of the then District Attorney's Special Directive 20-08. He argued that this Special Directive expressed a policy of not prosecuting gun allegations or enhancements because the sentencing ranges associated with the substantive charges were sufficient punishment to protect public safety and serve the ends of justice. He also argued that the then District Attorney's Special Directive 20-08.1, which clarified the policy and in part directed prosecutors to seek dismissal under section 1385 of all strike priors and other enhancements when in the interests of justice (not done here), required the court to consider the District Attorney's Special Directives and "use its discretion [under section 1385] to strike the special gun allegations and their accompanying sentencing enhancements," citing *Nazir v. Superior Court of Los Angeles County* (2022) 79 Cal.App.5th 478 (*Nazir*).

While his counsel acknowledged that current law at sentencing generally recognized a trial court's discretion to strike firearm enhancements, Rodriguez did not specifically ask the trial court to strike any enhancements under section 12022.53, subdivision (h), which authorizes a trial court to "strike or dismiss an enhancement otherwise required to be imposed by this

---

[7]     After these verdicts, the prosecution withdrew its request for a trial and a verdict on the aggravating factors.

13

section" in the interests of justice under section 1385. Nor did he ask the court to impose a lesser enhancement under section 12022.53, subdivision (b) or (c) instead of the greater provided at subdivision (d), all of which had been pleaded and then found true by the jury as to the murder count (along with a section 12022.5(a) gun enhancement).

Rodriguez further argued in the sentencing memorandum that certain mitigating factors listed at rule 4.425 of the California Rules of Court supported the imposition of concurrent and not consecutive sentencing. These were (1) the crimes and their objectives were predominantly independent of each other; (2) the crimes involved separate acts of violence or threats of violence; and (3) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior. (Cal. Rules of Court, rule 4.425(a)(1)(2) & (3).)

The memorandum requested a sentence of one-third the midterm on count 2, or one year, concurrent to the indeterminate term on count 1, with all the firearm enhancements stricken per his argument based on the District Attorney's Special Directive 20-08.

Rodriguez also filed before sentencing a report by Nadim N. Karim, Ph.D. addressing mitigation factors. This report cited only Rodriguez's youth (age 20) at the time of the crime and related neurological reasons for his "lack of maturity and underdeveloped sense of responsibility which contributed to the reckless, impulsive, and risk-taking behavior that contributed to the instant offense."

At the sentencing hearing on July 20, 2023, Rodriguez's counsel further "remind[ed]" the court that Rodriguez was

14

"approximately 20 years old at the time of this crime" and had only a "minimal criminal record." Counsel also emphasized that the crimes seemed to be a "spontaneous" or "rash act" rather than something planned. He referenced the sentencing memorandum as containing factors mitigating against additional punishment for the gun enhancements on the murder count and reasons why the assault conviction "was all one course of conduct, one act," urging that the court had the discretion to not consecutively impose any additional punishment. The court indicated it had reviewed Rodriguez's sentencing memorandum and the psychological report.

The prosecutor, for his part, acknowledged that while Rodriguez had not planned to see Teodik at the taco stand, based on the trial evidence, Rodriguez had had time—two and a half minutes—between spotting Teodik at the taco stand and taking "the five shots into the crowd" to "consider his actions and not proceed." The prosecutor also emphasized that after the shooting, Rodriguez had told people he had previously told Teodik "that he was going to get him" and that "he did in fact then get him that night, showing that this thought process had been in his head for some time."

The prosecutor further acknowledged that Rodriguez had "almost no criminal record" but argued that the facts of the crime showed "an extreme danger to public safety in the number of people [who] were outside the taco stand" and the fact that another person aside from the intended victim had been hit. The prosecutor further offered that Rodriguez had a loaded gun in his possession after the crime and that there was trial evidence of photographs of firearms on his phone, which suggested that even after the murder, Rodriguez had "no intention of changing his

15

ways" and thus posed a danger to public safety "if and when [he] is ever released from custody."

The prosecutor argued for a sentence of 25 years to life on the murder count "plus a consecutive 25 to life on the 12022.53(d) allegation." On the assault count, he urged that Rodriguez's lack of a criminal record did not justify the low term of two years given the factors in aggravation, and he requested that the court impose the midterm of three years "plus a consecutive four years on the 12022.5(a) [enhancement], for seven years on that charge consecutive to the indeterminate sentence of 50 years to life."

The trial court queried whether if imposing consecutive sentences, the determinate sentence on the assault count would instead be "one-third the midterm." The prosecutor responded that that calculation does not apply when there is "an indeterminate sentence and then on top of that a determinate sentence," citing *People v. McGahuey* (1991) 121 Cal.App.3d 524, 531–532, and explaining his position that the one-third of the midterm calculation of section 1170.1, subdivision (a) applies when the court imposes consecutive determinate terms, but not to a determinate term running consecutively to an indeterminate life term set under section 1168, subdivision (b). Both sides acknowledged the trial court's discretion to impose consecutive or concurrent sentences, Rodriguez's counsel referring back to the sentencing memorandum and the prosecutor emphasizing Rodriguez's lack of remorse, as well as his continued possession of firearms after the crime as bearing on his future dangerousness.

The trial court sentenced Rodriguez to a total term of 57 years to life, as follows: (1) on count 1, first degree murder, a sentence of 25 years to life in state prison, plus 25 years to life for the section 12022.53(d) firearm enhancement, the punishment on

16

the other firearm enhancements stayed under section 654; and (2) on count 2, assault with a firearm, a consecutive sentence of the midterm of three years in state prison, plus the midterm of four years for the section 12022.5(a) gun enhancement.[8] The trial court explained that when selecting the midterm on count 2, it had considered "the extreme callousness with which this crime was committed" (Cal. Rules of Court, rule 4.421(a)(1) [crime involving high degree of "callousness" as circumstance in aggravation]), noting the court "was appalled at the way in which [Rodriguez] brazenly walked up to that taco stand with numerous people present. He had an intended target. That was clear from the evidence. He could have killed many other people in front of that taco stand. Frankly, it was just sheer luck that there was just one other person, a boy, that was injured as a result. [¶] And the way in which he acted after doing that act, getting into the car, the evidence shows the callousness with which he acted. He certainly has no record to speak of, but balancing all of these factors, the court thinks the [midterm] is the appropriate sentence for both the gun and the underlying [assault] crime."

The court awarded actual custody credits of 1,106 days, imposed a restitution fund fine of $300 (§ 1202.4, subd. (b)); a parole revocation restitution fund fine in like amount, stayed (§ 1202.45); a criminal conviction fee of $30 (Govt. Code, § 70373);

---

[8]     After refusing to come to court from the jail on the designated day of sentencing, Rodriguez made a request to relieve his retained counsel and represent himself at the continued date, along with a request for a further continuance of 90 days for sentencing. After considering multiple factors, including that the request appeared to be merely an attempt to delay rooted in "gamesmanship," the trial court denied the requests. Rodriguez claims no error on appeal from this ruling.

17

and a court security fee of $40 (§ 1465.8, subd. (a)(1)). The court reserved jurisdiction as to victim restitution, which was not yet quantified at the time of sentencing. Rodriguez timely appealed.

## DISCUSSION

### I. Sufficient Evidence Supports the First Degree Murder Conviction

Rodriguez contends that the conviction on count 1—first degree murder—is not supported by sufficient evidence that the murder was willful, deliberate, and premeditated and it should therefore be reduced to second degree murder.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt,' [Citation.]" (*People v. Hin* (2025) 17 Cal.5th 401, 451; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318–320 ["the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"]; *People v. Snow* (2003) 30 Cal.4th 43, 66.) This same standard applies in assessing the sufficiency of evidence whether it is direct or circumstantial. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

As set out at section 187, subdivision (a), "[m]urder is the unlawful killing of a human being … with malice aforethought." Murder that is willful, deliberate, and premeditated is murder in the first degree. (§ 189, subd. (a).) This requires more than a

18

showing of intent to kill. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) " ' " 'In this context, "premeditated" means "considered beforehand" and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " [Citation.] " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " [Citations.] "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citation.]' [Citation.]" (*People v. Morales* (2020) 10 Cal.5th 76, 88 (*Morales*); see also *People v. Potts* (2019) 6 Cal.5th 1012, 1027.) For premeditation and deliberation to be found, it is not necessary to show that the defendant maturely and meaningfully reflected on the gravity of the act. (*People v. Salazar* (2016) 63 Cal.4th 214, 245.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), our Supreme Court addressed the use of circumstantial evidence in proving first degree murder. The Court "identified 'three basic categories' of evidence [it] has generally found sufficient to sustain a finding of premeditation and deliberation: (1) planning activity, or 'facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing'; (2) motive, or 'facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim'; and (3) manner of killing, or 'facts about the nature of the killing from which the jury could infer that the *manner* of killing was so

19

particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take [the] victim's life in a particular way for a "reason'. . . .' [Citation.]" (*Morales, supra*, 10 Cal.5th at pp. 88–89.) "In the years since *Anderson*, ' "[the Supreme Court] ha[s] emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight." ' [Citation.]" (*Id.* at p. 89.) Further, "the Supreme Court has described the various *Anderson* categories in the disjunctive, inserting an 'or' in the series. . . ." (*People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1113.) " ' "The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premediated murder, nor are they exclusive." ' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1019.)[9]

The record here contains sufficient and substantial direct evidence of Rodriguez's premeditation and deliberation, even without resort to circumstantial evidence. He told Guerrero shortly after the shooting that he had been looking for Teodik. He said to Mkrtchyan immediately after the killing that he had "got[ten]" Teodik, that he had "said [he] was going to get him, and [he] did," and that he had "even told [Teodik] [he was] going to get him." He also told Mkrtchyan a week or so after the crime that he had previously told Teodik, "Next time I see you I'm going to get you." These are Rodriguez's own statements that he had

---

[9]      There is no claim here of instructional error on the law of murder, including what is required for willfulness, premeditation, and deliberation.

20

formed a plan to kill Teodik in advance. This is sufficient and substantial *direct* evidence of premeditation and deliberation.

Rodriguez's challenge to the evidentiary sufficiency of willfulness, premeditation, and deliberation does not confront this direct evidence. Instead, his focus is on circumstantial evidence of the planning factor as articulated in *Anderson*. He contends that because he indisputably came upon Teodik that night by happenstance and there is no evidence that he planned to encounter or kill Teodik on that specific night, his homicidal actions upon coincidentally seeing Teodik could only be characterized as rash and impulsive, not as taken through preexisting thought and reflection. But Rodriguez misreads how circumstantial facts may show planning for purposes of premeditation and deliberation. That he came upon Teodik unexpectedly that night does not mean there is insufficient evidence of planning. As noted, it is the extent of one's reflection and not the duration of time that matters, and a " 'cold, calculated judgment may be arrived at quickly' "—even upon a chance encounter with the intended victim—through thoughts that follow in rapid succession. (*Morales, supra*, 10 Cal.5th at p. 88.)

In addition to the direct evidence of premeditation and deliberation just cited, there was also testimony that Rodriguez was regularly armed and was that night, such that he was prepared for a chance encounter with Teodik that might arise. This was circumstantial evidence of planning. Rodriguez had not only thought about and had decided to kill Teodik in advance and had been looking for him to carry out the act, he had readied himself with a loaded gun in preparation for any spontaneous encounter with Teodik that presented itself. These facts are

21

evidence, or give rise to reasonable inferences, of Rodriguez's reflection, consideration, preparation, and knowledge of the consequences of his actions. That Rodriguez's encounter with Teodik that particular night was coincidental or that it took mere minutes from his eyeing Teodik at the taco stand, to his sudden direction to Mkrtchyan to pull over, to his flight on foot from the car towards Teodik, to his crossing the street, and to his taking the actual five shots, two of which hit Teodik, do not negate that the killing was nonetheless planned in the sense of satisfying the requirement of premeditation and deliberation.

Rodriguez does not challenge that there is substantial evidence in the record of *Anderson*'s two other circumstantial factors. There was evidence of motive—animus he bore towards Teodik from their failed business and prior sharing of a car about which they regularly argued and for which Rodriguez blamed Teodik. And on the manner of the killing, there were multiple gunshots directed at Teodik in a crowd with a firearm regularly carried in as if in preparation—as reflecting a " ' "preconceived design" to take [Teodik]'s life in a particular way for a "reason." ' " (*Morales, supra*, 10 Cal.5th at p. 89.) Even if the circumstantial evidence of planning were not strong, in applying the *Anderson* factors, " 'some evidence of motive in conjunction with planning or a deliberate manner of killing' " may suffice to show premeditation and deliberation. (*People v. Cole* (2004) 33 Cal.4th 1158, 1224; see also *People v. Combs* (2004) 34 Cal.4th 821, 850 [*Anderson* factors "are not exclusive, nor are they invariably determinative"].)

In sum, despite Rodriguez seeing Teodik at the taco stand on the night of the murder only by happenstance, and viewed in the context of the applicable standard of review, the record

contains sufficient and substantial evidence—direct and circumstantial—of Rodriguez's willfulness, premeditation, and deliberation in the commission of the crime to uphold the conviction on count 1 for first degree murder.

II.     **No Error in Not Striking the Greater Sentence for the Section 12022.53(d) Firearm Enhancement on Count 1 in Favor of a Lesser Section 12022.53 Enhancement**

As noted, in connection with the murder charge in count 1, the amended information also alleged firearm enhancements under section 12022.53, subdivisions (b), (c), and (d), along with section 12022.5(a). And the jury was instructed on and rendered true findings as to all these enhancements. Rodriguez did not request the trial court at sentencing, either orally or by his written sentencing memorandum, to strike or dismiss any section 12022.53 enhancements under subdivision (h) of that section, which, since 2022, has expressly authorized that relief under section 1385 in the interests of justice. Nor did he ask the court to strike the section 12022.53(d) enhancement, which imposes the greater punishment, in favor of either of the section's lessers at subdivisions (c) or (b).

Rodriguez claims on appeal that the trial court erred by failing to consider the imposition of a lesser sentence on the firearm-use enhancement as to the murder conviction. He contends remand is required because the record is silent as to the trial court's awareness of its discretion to have struck the greater section 12022.53 enhancement in favor of a lesser. And on remand, he argues, the trial court must exercise its discretion under section 12022.53, subdivision (h), which rests on the discretion afforded under section 1385, as animated by the same

23

authority underlying *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*). (See *People v. Rocha* (2019) 32 Cal.App.5th 352, 359.)

" 'Section 12022.53 was first enacted in 1997 as part of the state's "Use a Gun and You're Done" law. (Stats. 1997, ch. 503, § 1 et seq., p. 3135.) The statute sets out "sentence enhancements for personal use or discharge of a firearm in the commission" of specified felonies. [Citation.] Section 12022.53, subdivision (a) lists the felonies to which the section applies," which include murder at subdivision (a)(1). (*People v. McDavid* (2024) 15 Cal.5th 1015, 1023 (*McDavid*), citing *People v. Tirado* (2022) 12 Cal.5th 688, 694–695 (*Tirado*), fn. omitted.)

Section 12022.53 then provides three different and escalating sentence enhancements for the personal use of a firearm in the commission of enumerated offenses: a 10-year enhancement for the personal use of a firearm (§ 12022.53, subd. (b)); a 20-year enhancement for the personal and intentional discharge of a firearm (§ 12022.53, subd. (c)); and a 25-year-to-life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death (§ 12022.53(d)). (See *Tirado*, *supra*, 12 Cal.5th at p. 695.)

Section 12022.53, subdivision (f) provides that only one additional term of imprisonment under this section may be imposed per person for each crime, and if more than one enhancement per person is found true, the court must impose the enhancement that provides the longest term of imprisonment. And section 12022.53, subdivision (j) provides that "when a section 12022.53 enhancement is alleged and found true, 'the court shall impose punishment for that enhancement pursuant to this section rather than imposing punishment under any other

24

law' unless another enhancement provides for a greater penalty." (*McDavid, supra*, 15 Cal.5th at pp. 1022–1025.)

Section 12022.53, subdivision (h) was amended in 2022, before sentencing in this case, from precluding the striking of an enhancement enumerated in this section under section 1385 to expressly allowing the exercise of such discretion. Subdivision (h) now provides, and did so at the time of sentencing here, that "[t]he court may, in the interests of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section."

In *Tirado*, decided in 2022 before Rodriguez was sentenced, our Supreme Court held that the discretion to strike an enhancement in the interests of justice provided at section 1385 "includes striking a section 12022.53 enhancement and then imposing a lesser included, uncharged section 12022.53 enhancement when the facts supporting the lesser enhancement were alleged and found true by the jury." (*McDavid, supra*, 15 Cal.5th at p. 1025, citing *Tirado, supra*, 12 Cal.5th at p. 700.) Thus, *Tirado* addressed a trial court's discretion to impose a lesser included but *uncharged* enhancement, whether within or without section 12022.53, after striking one of the section's greater enhancements.

Rodriguez specifically claims here, citing *Tirado*, that in imposing the punishment for the 25-to-life greater enhancement under section 12022.53(d), the trial court abused its discretion by failing to consider striking this enhancement and instead imposing one of the lesser included enhancements of 10 or 20 years as provided at section 12022.53, subdivisions (b) or (c), respectively, which were also charged and found true by the jury. The People respond that Rodriguez forfeited this issue on appeal

25

by having failed to request this relief in the trial court, that Rodriguez has not shown the trial court abused its discretion or was unaware of or did not understand the scope of that discretion, and that the record in any event shows the trial court would have declined to strike the greater section 12022.53 enhancement in favor of a lesser.

Sentencing decisions are subject to review for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847 (*Sandoval*), abrogated on a different ground in *People v. Lynch* (2024) 16 Cal.5th 730, 759 (*Lynch*).) The abuse of discretion standard "asks in substance whether the rule in question 'falls outside the bounds of reason' under the applicable law and the relevant facts." (*People v. Williams* (1998) 17 Cal.4th 148, 162 (*Williams*).) " 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 (*Gutierrez*).) Thus, "[a]n abuse of discretion occurs when the trial court . . . is unaware of its discretion." (*In re White* (2020) 9 Cal.5th 455, 470.) But, "[a]bsent evidence to the contrary, we presume that the trial court knew and applied the governing law." (*Gutierrez*, at p. 1390; see *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 398 [same]; *People v. Myers* (1999) 69 Cal.App.4th 305, 310 ["The court is presumed to have considered all of the relevant factors"].)

The burden is on the party attacking the sentence to show an abuse of discretion has occurred. (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.) "To meet this burden, the [appellant] must 'affirmatively demonstrate that the trial court misunderstood its sentencing discretion.' " (*People v. Lee* (2017) 16 Cal.App.5th 861, 866 (*Lee*); see Cal. Rules of Court, rule 4.409

[relevant sentencing factors enumerated in Cal. Rules of Court are "deemed to have been considered unless the record affirmatively demonstrates otherwise"].) We do not infer an abuse of discretion from a silent record. (*People v. Czirban* (2021) 67 Cal.App.5th 1073, 1097 (*Czirban*); *People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527.)

" 'Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing.' [Citation.] 'Remand for resentencing is not required, however, if the record demonstrates the trial court was aware of its sentencing discretion. [Citations.] Further, remand is unnecessary if the record is silent concerning whether the trial court misunderstood its sentencing discretion. Error may not be presumed from a silent record. [Citation.] " '[A] trial court is presumed to have been aware of and followed the applicable law.' " ' [Citation.]" (*Czirban, supra,* 67 Cal.App.5th at pp. 1096–1097.)

The forfeiture doctrine applies to sentencing decisions. The California Supreme Court has repeatedly held that "complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*People v. Scott* (1994) 9 Cal.4th 331, 351–356 (*Scott*); see *People v. Wall* (2017) 3 Cal.5th 1048, 1075 ["[A] defendant forfeits on appeal any 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' in the absence of objection below"].) The rule of forfeiture applies in " 'cases in which the stated reasons allegedly do not apply to the particular case, and cases in which

the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or to give a sufficient number of valid reasons.' " (*People v. Boyce* (2014) 59 Cal.4th 672, 730–731; *People v. Scott* (2015) 61 Cal.4th 363, 406 (*Scott II.*)

Applying these principles here, we conclude that Rodriguez has forfeited his claim that the trial court erred in not striking the section 12022.53(d) enhancement in favor of a lesser by his failure to have raised it below. Although in his motion for acquittal and at sentencing he requested the court to strike all enhancements in this case based on the then District Attorney's Special Directive 20-08 and principles of equal protection, he did not otherwise or specifically seek the striking of the greater enhancement at section 12022.53(d), which imposes indeterminate punishment of 25 to life, or the imposition of one of the lesser enhancements at section 12022.53, subdivision (b) or (c) in its place. He did not invoke the authority of section 12022.53, subdivision (h), which incorporates the provisions and authority of section 1385, nor did he otherwise directly invoke section 1385 or assert arguments in the vein of *Romero* to show that dismissal would be in the interests of justice.

Even if the issue were not forfeited, the argument as framed on appeal in reliance on *Tirado* is inapposite. As noted, *Tirado*, which was issued before sentencing here, held that the statutory framework of section 12022.53 permits a trial court to exercise discretion at sentencing to dismiss or strike a greater section 12022.53 enhancement that has been pled and found true and instead impose an *uncharged* lesser section 12022.53 enhancement as to which the required facts, necessarily incorporated into the greater enhancement by the statutory

28

language, have likewise been found true. (*Tirado, supra*, 12 Cal.5th at p. 700.) Unlike in *Tirado*, here, all three section 12022.53 enhancements were alleged in the amended information and found true by the jury. And section 12022.53, subdivision (h) had already been amended to expressly authorize the striking of the section's enhancements under the authority of section 1385. Therefore, we presume on appeal that the trial court was aware of and understood its sentencing discretion and choices and acted in accordance with this understanding, in the absence of an affirmative showing otherwise. Rodriguez points only to a purportedly "silent" record, which does not meet his burden on appeal.

Finally, in addition, Rodriguez fails to show prejudice on this record resulting from the alleged error. When the trial court here selected the midterm sentence on count 2, the assault conviction, and the midterm on the section 12022.5(a) enhancement on that count, it acknowledged that Rodriguez had "no record to speak of" but twice emphasized the "extreme callousness" with which he had acted, adding that the court had been "appalled at the way in which [Rodriguez had] brazenly walked up to that taco stand with numerous people present" and how it was just out of "sheer luck" that no one other than Hamlet P. had also been hit. Rodriguez's counsel had cited the mitigating factors of his age of 20 at the time of the murder and his lack of criminal record. The prosecutor cited the aggravating facts of the crime as showing "an extreme danger to public safety," and emphasized how Rodriguez's continued possession of firearms after the crime and photographs of guns found on his phone showed that "he had no intention of changing his ways."

After that discussion and imposition of the midterm on count 2, the trial court said that "balancing all of these factors, the court thinks the midterm is the appropriate sentence for both the gun and the underlying crime." In context, we view the record here to show that the court's reference to its balancing of all the mitigating and aggravating factors just discussed in the sentencing hearing and then coming down at the midterm for count 2 clearly shows that the court would not have struck the greater section 12022.53(d) enhancement on count 1, whether to avoid adding punishment for any firearm enhancement on that count or to impose a lesser enhancement in its place. (*Gutierrez, supra*, 58 Cal.4th at p. 1391 [if it is shown that trial court was unaware of its full sentencing discretion, proper remedy is remand unless the record clearly indicates trial court would have reached the same conclusion]; *People v. Salazar* (2023) 15 Cal.5th 416, 431 (*Salazar*) [remand required for resentencing unless record clearly shows it would be an idle act].) We therefore conclude that even if this claim were not forfeited, and even if error had been shown, any such error would be harmless.

## III. No error in the Imposition of the Midterm on the Assault Conviction

In his sentencing memorandum, Rodriguez requested for count 2 that he receive a sentence of one year—one-third the midterm (triad: two, three, or four years per § 245, subd. (a)(2))—concurrent to the indeterminate term on the murder count, with the section 12022.5(a) gun enhancement stricken. The stated rationale for this request both in the memorandum and at the sentencing hearing was that the crimes were "all one course of conduct, one act." Again, Rodriguez also highlighted in his sentencing memorandum and at the hearing as a mitigating

30

factor his youth at the time of crime—20 years old—and the related neurological information on brain development contained within the psychological report he submitted, which opined that his youth had contributed to the crime. He also flagged his "minimal criminal record." Again, the court at sentencing acknowledged having reviewed both the sentencing memorandum and the psychological report.

As noted, the prosecutor acknowledged at sentencing that Rodriguez had "almost no prior criminal record" apart from one arrest as a juvenile for shoplifting, but the prosecutor argued for the court to impose the midterm sentence of three years on count two, with an additional midterm of four years for the gun use enhancement at section 12022.5(a), consecutive to the indeterminate term on count 1. The prosecutor emphasized as aggravating the nature of the crimes and Rodriguez's continued gun possession thereafter with the related photos of guns found on his phone, as bearing on his "extreme danger to public safety." The prosecutor also mentioned Rodriguez's lack of remorse.

As to the prosecutor's position when queried by the court that the one-third-the-midterm calculation does not apply to a determinate term imposed consecutively to an indeterminate term, defense counsel replied: "I don't know that I necessarily agree with [that]. I think I laid out my position as well as I could in my [sentencing memorandum], and regardless of what [the prosecutor] just said, I still think the court can give concurrent time related to [count 2], and that's what we're requesting." Counsel did not request the low term of two years if the court were to impose a consecutive sentence, based on section 1170 or any other reason. Nor did counsel assert that any departure from

the low term based on aggravating factors required those factors to be found true beyond a reasonable doubt.

As noted, just after counsels' arguments on aggravating and mitigating circumstances, and after having indicated that it had reviewed Rodriguez's sentencing memorandum and psychological report addressing his youth, the court proceeded to sentence. In imposing the midterm of three years on count 2, plus the midterm of four years for the gun enhancement, consecutive, the court acknowledged Rodriguez's lack of a criminal record but expressly took into account the "extreme callousness" of the crimes (Cal. Rules of Court, rule 4.421(a)(1) [circumstances in aggravation]; rule 4.425(b) [factors in aggravation or mitigation may be used in the decision whether to impose concurrent or consecutive sentences]), noting its "appal[ment]," and concluded that "balancing all of these factors"—referencing the immediately prior discussions with counsel on mitigating and aggravating circumstances—"the court thinks the [midterm] is the appropriate sentence for both the gun and the underlying crime." The court thus imposed three years for the assault conviction, plus four years for the gun-use enhancement, consecutive, on top of the indeterminate term for the murder conviction.

Rodriguez contends for the first time on appeal that with respect to the sentence for assault, the court "failed to consider his youth at the time of the commission of the offense," citing section 1170, subdivision (b)(6)(B), and "improperly relied on 'callousness' as an aggravating factor that was never presented to the jury for consideration."[10] He contends the court was required

---

[10]  Rodriguez does not claim that his sentence on count 2 should have been what he asked for—one year as one-third of the midterm.

to impose the low term of two years on count 2, under Senate Bill 567, effective January 1, 2022 (Stats. 2021, ch. 731, § 1.3), as affecting section 1170.[11] The People respond that this claim is forfeited, not having been raised below, and on the merits, that the court properly exercised its discretion to impose the midterm of three years on count 2 under section 1170, subdivision (b)(6), even with youth as a contributing factor and without true findings on aggravating factors such as the "extreme callousness" of the crime, determined as more weighty by the court, because such findings on aggravators are required only for imposition of the high term under section 1170, subdivision (b)(2). And, finally, the People urge that even if it is shown that the trial court misunderstood its sentencing discretion for count 2, it is clear from the record the court would have imposed the same sentence.

As we have observed with respect to the preceding claim of sentencing error on the murder count, forfeiture applies to claims of discretionary sentencing error. (*Scott, supra*, 9 Cal.4th at p. 356; *Scott II, supra*, 61 Cal.4th at p. 406.) And the burden is on a defendant challenging a discretionary sentence to affirmatively show error; it is not presumed. (*Gutierrez, supra*, 58 Cal.4th at p.

---

Nor does he challenge that the sentence on count 2 was imposed consecutively.

[11]     Section 1170 was again amended by Assembly Bill 960, effective January 1, 2023 (Stats. 2022, ch. 744, § 1), and again by Assembly Bill 1104, effective January 1, 2024 (Stats. 2023, ch. 560, § 2.5). But these amendments left intact the relevant provisions of the statute operative here. Thus, the provisions of this statute as quoted or discussed here were as in effect at sentencing in July 2023, and remain so.

390; *Czirban, supra*, 67 Cal.App.5th at p. 1097; *Lee, supra*, 16 Cal.App.5th at p. 866.)

Here, not only did Rodriguez not request the low term of two years on the assault count or argue in the trial court that the low term must be imposed under section 1170, subdivision (b)(2)(B) because of his youth, he affirmatively advocated for a sentence of one-third the midterm. And he did not object when the prosecutor discussed aggravating circumstances for a midterm sentence or when the court cited the "extreme callousness" of the crimes as a predominant aggravating factor in the court's balancing of "all" the applicable sentencing factors that had just been identified. Nor did he object to the sufficiency of the court's findings or its stated rationale for imposing the midterm sentence on count 2.

We conclude that this issue has been forfeited on appeal. The version of the relevant provisions of section 1170, as amended by Senate Bill 567, as the basis of this claim had been in effect at the time of sentencing for more than a year, and Rodriguez argued for a midterm sentence. And there is no argument that the sentence imposed was somehow unauthorized.

We further conclude that even if not forfeited, Rodriguez's claim of error as to the imposition of the midterm sentence on count 2 lacks merit, as no error or abuse of discretion in the sentencing choice, or even misapprehension or misunderstanding of the scope of the trial court's discretion, has been shown.

Section 1170, subdivision (b)(1) provides in pertinent part: "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence *not to exceed the middle term*" except under subdivision (b)(2). (Italics added, see also Cal.

Rules of Court, rule 4.420(a) [same].) Section 1170, subdivision (b)(2) in turn requires circumstances in aggravation justifying a sentence "*exceeding the middle term*" to "have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (Italics added.) Section 1170, subdivision (b)(6) then provides as relevant here that "[n]otwithstanding" subdivision (b)(1), "and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (B) The person is a youth or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense."[12] Rodriguez contends these provisions together required the imposition of the lower term of two years on count 2, and that any higher term required aggravating circumstances justifying departure to have been found true beyond a reasonable doubt.

We independently interpret the statute at issue. (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) Our task is to determine the Legislature's intent by first resort to the statutory language, giving it a plain and commonsense meaning. If the language is clear, we generally follow its plain meaning unless a literal interpretation would result in unintended absurdity. If the language is ambiguous, we may consider other interpretive aids. And we consider portions of a statute in the context of its whole

---

[12]     Section 1016.7, subdivision (b) provides that a " 'youth' " "includes any person under 26 years of age on the date the offense was committed." Rodriguez satisfies this definition.

and the entire scheme of which it is a part. (*People v. Reynoza* (2024) 15 Cal.5th 982, 989–990.)

We view the provisions of section 1170 relied on by Rodriguez here to be plain in meaning and free from ambiguity. The version of section 1170 in effect before January 1, 2022, "vested the court with 'sound discretion' to simply weigh circumstances in aggravation or mitigation, and any other relevant factors, and then impose any of the three prescribed terms (low, middle, or high) it found to 'best serve[] the interests of justice' (§ 1170, former subd. (b).)" (*Salazar, supra,* 15 Cal.5th at p. 426.) The version of section 1170, subdivision (b) that went into effect on January 1, 2022, over a year before sentencing in this case, made "the middle term the presumptive sentence for a term of imprisonment unless certain circumstances exist." (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1038 (*Flores*).) The same amendments to the statute created a presumption in favor of the lower term sentence when, among other things, a person's youth was a contributing factor in the commission of the offense. (§ 1170, subd. (b)(6) & (b)(6)(B).) The new law "dramatically restrains" the trial court's discretion to impose the middle or upper term, and now the sentencing court may depart from this lower term presumption where the specified circumstances are applicable only "if it finds that the aggravating circumstances outweigh the mitigating circumstances such that the lower term would be contrary to 'the interests of justice.' " (*Salazar, supra,* 15 Cal.5th at pp. 426, 419.) But there is no requirement to impose the low term and the court remains free to impose the middle term once the low term presumption is overcome—when it finds that aggravating factors outweigh mitigating factors such that the lower term would not be in the interests of justice. (*Id.* at pp.

419, 426–427, 429–430; see also *Lynch, supra,* 16 Cal.5th at p. 771.)

Thus, section 1170, subdivision (b)(6)(B) now makes the lower term sentence the presumptive term of imprisonment if a defendant's "youth" was a "contributing factor" in the commission of the offense; this does not mean the presumption exists in every case in which a defendant was under age 26. Rather, to trigger the presumption, there must be some initial showing that the defendant's youth was a contributing factor in the commission of the crime. (*People v. Fredrickson* (2023) 90 Cal.App.5th 984, 991–992; *People v. Archane* (2023) 92 Cal.App.5th 1037, 1044.) Further, even when the lower term presumption is triggered, it is rebuttable. "Section 1170, subdivision (b)(6) plainly states that the court may sentence above the low term if the aggravating circumstances 'outweigh the mitigating' ones such that 'imposition of the lower term would be contrary to the interests of justice.' This language is unambiguous." (*People v. Knowles* (2024) 105 Cal.App.5th 757, 766.) The statute does not require the imposition of the low term except where it would be " 'irrational or indefensible.' Nor does the statute require the aggravating factors not just outweigh the mitigating factors but also outweigh them by some undefined additional quantum of proof." (*Ibid.*)

The record here includes evidence that Rodriguez's youth and related "neurological reasons" were a contributing factor in his commission of the crimes—the psychologist's report that specifically so concluded. This triggered the low-term presumption of section 1170, subdivision (b)(6)(B) and required the sentencing court to find that aggravating circumstances outweighed mitigating circumstances such that "imposition of the

37

lower term would be contrary to the interests of justice" to impose the midterm. (§ 1170, subd. (b)(6).) Our reading of the record leads us to conclude that the court, understanding and apprehending what this statute requires, did just that even though the court did not specifically refer to the statute or expressly recite its words when making the finding that the midterm was appropriate. (See Cal. Rules of Court, rule 4.406 [if reasons are required for a sentencing choice, judge must state primary factors for sentencing choice in simple language; statement need not be in the language of the statute].) The court is presumed to have been aware of the operative provisions of section 1170, subdivision (b)(6). The court said it had reviewed Rodriguez's sentencing memorandum addressing his youth as a mitigating factor and the accompanying psychological report referencing that his youth was a contributing factor in his commission of the crime. And the court said that in balancing "*all* of these factors" (italics added), which included Rodriguez's youth and the "extreme callousness" with which the crime was committed, "the [midterm] is the appropriate sentence."

On this record, it cannot be said that the trial court was unaware of or did not consider Rodriguez's youth in the exercise of its sentencing discretion, or that the court failed to find that aggravating circumstances outweighed mitigating ones such that the lower term would be contrary to the interests of justice. (§ 1170, subd. (b)(6).) On the contrary, the record is not "silent" as to the court's discretionary determinations even without specific or express reference to section 1170, subdivision (b)(6). And it is sufficient to show that the trial court's sentencing discretion was exercised in conformance with section 1170, subdivisions (b)(6)

38

and (b)(6)(B), leading to a permissibly imposed midterm sentence on count 2.

As to Rodriguez's claim that the court erroneously used the aggravating circumstance of the "extreme callousness" with which the crime was committed—or any other aggravator discussed and "balance[d]" at sentencing—to impose the midterm on count 2 without these circumstances having been found true beyond a reasonable doubt, his opening brief appears to suggest a violation of section 1170, subdivision (b)(2). But as pointed out in the respondent's brief, section 1170, subdivision (b)(2) imposes this evidentiary proof requirement only when the court is imposing a "term of imprisonment *exceeding* the middle term." (Italics added.) That didn't happen here.

Rodriguez's opening brief also cites *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*) without pin cite or any analysis for the general proposition that "all aggravating factors not related to a defendant's criminal history are to be tried before a jury." This throwaway statement is not a developed argument.

In his reply brief, Rodriguez acknowledges that section 1170, subdivision (b)(2) does not require aggravating circumstances to be found true beyond a reasonable doubt when imposing the midterm. (See *People v. Bautista-Castanon* (2023) 89 Cal.App.5th 922, 928–929 (*Bautista-Castanon*); *People v. Hilburn* (93 Cal.App.5th 189, 204 (*Hilburn*).) But he pivots to the contention, addressed and rejected in *Bautista-Castanon* and *Hilburn*, that once the court finds youth was a contributing factor in the commitment offense, the lower term becomes the " 'statutory maximum' " as defined in *Blakely v. Washington* (2004) 542 U.S. 296, 303–304—i.e., the "maximum

39

sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." (*Ibid*.) He then posits that if the lower term is the "statutory maximum," then the trial court may not impose the middle term without finding, beyond a reasonable doubt, one or more aggravating factors, which under *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) must be pled and proven at trial or admitted by the defendant. And he contends in reply that *Hilburn* "misconstrued the effect of *Apprendi* and *Cunningham* by failing to recognize that the lower term becomes the 'statutory minimum' when the trial court finds a defendant's youth was a contributing factor such that the trial court no longer has discretion to impose the middle term."

It is improper to raise an argument for the first time in a reply brief. " ' "Withholding a point until the reply brief deprives the respondent of an opportunity to answer it. . . . Hence, a point raised for the first time [in a reply brief] is deemed waived and will not be considered, unless good reason is shown for failure to present it before." ' [Citations.]" (*People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1030, fn. 8.) Rodriguez provides no explanation for why this argument was not raised or developed in his opening brief and we deem it waived.

But even if the argument had been properly raised, we are not convinced that under section 1170, the lower term becomes the "statutory minimum" once a trial court finds that subdivision (b)(6) applies. Subdivision (b)(1) first authorizes and makes presumptive the middle term based on the verdict, giving the trial court discretion to impose either a middle term or a lower term sentence. (§ 1170, subd. (b)(1) ["the court shall, in its sound discretion, order imposition of a sentence not to exceed the

40

middle term"]; § 1170, subd. (b)(7) ["Paragraph [(b)(6)] does not preclude the court from imposing the lower term even if there is no evidence of those circumstances listed in paragraph (6) present"].) Thereafter, when the court finds subdivision (b)(6) does apply, its discretion is directed to determining whether imposing the lower term would be "contrary to the interests of justice," in which case the already authorized middle term would be imposed.

Apprendi prohibits judicial factfinding to impose a sentence beyond what the sentencing scheme authorizes from the verdict alone; it does not limit the trial court's discretion to consider "various factors relating both to [the] offense and offender [] in imposing a judgment *within* the range prescribed by statute." (*Apprendi, supra*, 530 U.S. at p. 481.) According to *Cunningham*, the Sixth Amendment is not violated unless the verdict alone does not authorize the sentence and "instead, the judge must find an additional fact to impose the longer term." (*Cunningham, supra*, 549 U.S. at p. 290.) The pre-determinate sentencing law invalidated in *Cunningham* "authorize[d] the judge, not the jury, to find the facts permitting an upper term sentence." (*Id.* at p. 293.) In contrast, under the operative provisions of section 1170, any aggravating circumstances rendering a subdivision (b)(6)

lower term inappropriate lead only to the imposition of the middle term already authorized under subdivision (b)(1).

For all these reasons, we reject Rodriguez's claim of error in the midterm sentence on count 2, concluding it is forfeited and alternatively lacking in merit.

## IV. No Error in Declining to Strike Section 12022.5(a) Firearm Enhancement on Count 2

Rodriguez further claims with respect to the assault count that under amendments to section 1385 effective January 1, 2022, resulting from the enactment of Senate Bill 81 (Stats. 2021, ch. 721, § 1), the trial court should have but did not exercise its discretion to dismiss the section 12022.5(a) firearm enhancement, as to which the court imposed a midterm of four years added to the midterm of three years on the assault conviction, consecutive. The People respond that this claim, too, has been forfeited and, in any event, the record shows no abuse of discretion or prejudice.

Again, before sentencing, Rodriguez's sentencing memorandum requested dismissal of all the gun enhancements as to both counts based on the District Attorney's Special Directive 20-08 on the basis that punishment on the substantive counts alone was "sufficient [both] to punish the defendant and serve the ends of justice." His argument was premised on a claimed equal protection violation. He further generally cited in his memorandum three factors from rule 4.425 of the California Rules of Court bearing on judicial discretion to impose consecutive as opposed to concurrent sentences. Rodriguez argued that these factors leaned in favor of concurrent punishment. Neither in his sentencing memorandum nor at the sentencing hearing did Rodriguez request dismissal of the section 12022.5(a) gun enhancement on count 2 under section 1385,

subdivision (c), which had been in effect for more than a year, or on the basis of any of the factors listed at subdivision (c)(2). Nor was this issue expressly addressed at sentencing by either side or the court.

The trial court holds power under section 1385, subdivision (a), "in furtherance of justice, [to] order an action to be dismissed." As to sentence enhancements, this includes the "authority to strike the additional punishment or to strike the enhancement altogether." (*People v. Barboza* (2021) 68 Cal.App.5th 955, 965.) Subdivision (c) of section 1385 now provides direction to courts in applying their discretion to strike enhancements. It instructs them to "consider and afford great weight to evidence offered by the defendant to prove that any of several mitigating circumstances . . . are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2).)

Section 1385, subdivision (c)(2) lists nine potential mitigating factors, two of which Rodriguez invokes on appeal. These are (1) "Multiple enhancements are alleged in a single case. In this instance all enhancements beyond a single enhancement shall be dismissed"; and (2) "The application of an enhancement could result in a sentence of over 20 years. In this

instance, the enhancement shall be dismissed." (§ 1385, subd. (c)(2)(B) & (C).)

In *People v. Walker* (2024) 16 Cal.5th 1024 (*Walker*),[13] our Supreme Court instructed courts to apply the language in section 1385, subdivision (c)(2) as follows: "[I]f the court does not conclude that dismissal would endanger public safety, then mitigating circumstances strongly favor dismissing the enhancement. But ultimately, the court must determine whether dismissal is in the furtherance of justice. This means that, absent a danger to public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' " (*Walker, supra,* 16 Cal.5th at p. 1036, quoting *People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1098.) The *Walker* court rejected some prior court of appeal holdings to the effect that new section 1385, subdivision (c)(2) created a rebuttable presumption in favor of striking an enhancement when a specified mitigating circumstance was proven. Instead, the high court clarified that it does not. (*Walker, supra,* 16 Cal.5th at p. 1033.)

The law of forfeiture and presumptions on appeal discussed above applies with equal force to a claim of error based on the denial of a request to strike sentence enhancements. And we likewise apply an abuse of discretion standard of review to the

---

[13] The Supreme Court's opinion in *Walker* had not yet issued when Rodriguez filed his opening brief on appeal.

merits of such a claim. (*Sandoval, supra,* 41 Cal.4th at p. 847; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 298; *Flores, supra,* 63 Cal.App.5th at p. 376.)

Although Rodriguez raised other mitigating circumstances at sentencing and requested the striking of all enhancements on a separate basis, he did not mention or invoke section 1385, subdivision (c). He did not raise either of the two mitigating circumstances he now identifies at section 1385, subdivisions (c)(2)(B) or (C), which are different in subject matter from the other mitigating factors he asserted below that likewise apply to his other claims of sentencing error on appeal. He therefore did not argue that the trial court should consider these two circumstances listed at section 1385, subdivisions (c)(2)(B) and (C) in deciding whether to strike the section 12022.5(a) gun enhancement attached to count 2. And the record contains no reference to these factors or a ruling on them, or on section 1385, subdivision (c)(2)'s threshold inquiry whether dismissal would endanger public safety, or on its " 'ultimate question . . . whether it is in the furtherance of justice to dismiss an enhancement' " (*Walker, supra,* 16 Cal.5th at p. 1033) answered in the larger context of section 1385's " 'holistic balancing' " (*id.* at p. 1036) involving " ' "matters such as the defendant's background, character, and prospects," ' " that are " 'long deemed essential to the "furtherance of justice" inquiry.' " (*Id.* at p. 1038 (conc. opn. of Corrigan, J.).) We note that while section 1385 requires the court to state its reasons for granting relief (*id.* at p. 1036, fn. 6), the court is not required to provide reasons for a denial. (*In re Large* (2007) 41 Cal.4th 538, 550.)

The onus was not on the trial court to raise or consider on its own the presence of unmentioned mitigating circumstances

45

enumerated in section 1385, subdivision (c)(2). Indeed, the statute assigns *to the defendant* the burden of proving the existence of a mitigating circumstance. (§ 1385, subd. (c)(2) ["the court shall consider and afford great weight to evidence *offered by the defendant to prove* that any of the mitigating circumstances … are present" (italics added)].) We add that section 1385, subdivision (a) provides that "a judge or magistrate may, either on motion of the court or upon the application of the prosecuting attorney, and in furtherance of justice, order" dismissal of an action, which includes dismissal of the entire action or only an enhancement allegation. (*Nazir, supra*, 79 Cal.App.5th at pp. 490–491.) " 'A defendant has no [statutory] right to make a motion [to dismiss . . .], and the trial court has no obligation to make a ruling, under section 1385. But [a defendant] does have the right to "invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading, and the court must consider evidence offered by the defendant in support of [their] assertion that the dismissal would be in furtherance of justice." [Citation.]' " (*People v. Loper* (2015) 60 Cal.4th 1155, 1167 (*Loper*).) *Loper* acknowledged that a defendant's inability to move for dismissal under section 1385 should not preclude the raising on appeal of the erroneous failure by the trial court to have granted relief. But this does not alter the rules of forfeiture and a defendant's need to preserve claims of error, which is arguably heavier when the issue concerns judicial action that is not obligatory, unlike certain mandates involved in Rodriguez's other claims of sentencing error, and the exercise of trial court discretion that was not ever properly invoked such that the court had an obligation to rule or state any basis for a ruling.

46

We conclude that this claim of sentencing error has been forfeited. We decline to alternatively address the merits in the absence of a proper record that would permit appellate review of a trial court decision specifically made under section 1385, subdivision (c). We view such an exercise on this deficient record to require speculation, which we decline to engage in, particularly when the reasons for applying forfeiture are as compelling as they are here.

## V. No Error or Violation of Rights Based on LA DA Special Directives

As noted, Rodriguez included in his oral section 1118.1 motion at trial an asserted but undeveloped argument that the prosecution of firearm enhancements in his case violated equal protection. He had been charged before George Gascón as the then Los Angeles County District Attorney had issued Special Directive 20-08, which set a policy of not prosecuting strike priors or enhancements, whereas defendants charged later than Rodriguez enjoyed the benefit of this policy. Then, in his written sentencing memorandum, Rodriguez renewed this argument and based on it, requested the striking of all firearm enhancements. The court expressly rejected the argument in the context of its denial of the section 1118.1 motion and implicitly rejected it at sentencing by its imposition of punishment for the firearm enhancements on both counts.

On appeal, Rodriguez again contends the firearm enhancements should be stricken "in light of Special Directive 20-08" under "equal protection principles." His reprised argument, again, does not fully articulate a true equal protection claim.

The Los Angeles District Attorney's Special Directive 20-08, issued in December 2020, after Rodriguez was initially charged,

47

was a "policy direct[ing] all deputy district attorneys 'to orally amend the charging document to dismiss or withdraw any [sentence] enhancement' alleged in a pending case." (*Nazir, supra*, 79 Cal.App.5th at p. 485.) "The Special Directive explained that 'the current statutory ranges for criminal offenses alone, without enhancements, are sufficient to both hold people accountable and also to protect public safety' and that 'studies show that each additional sentence year causes a 4 to 7 percent increase in recidivism that eventually outweighs the incapacitation benefit.' An appendix to Special Directive 20-08 stated that there was no compelling evidence California's 100-plus sentence enhancements improved public safety, that such enhancements contributed to prison overcrowding, and that they 'exacerbate[d] racial disparities in the justice system.' The appendix also stated 'long sentences do little' to deter crime." (*Id.* at 486.)

On December 15, 2020, the District Attorney issued a clarification to Special Directive 20-08, known as Special Directive 20-08.1, which included language for deputy district attorneys to use to make a record when moving to dismiss sentence enhancements under Special Directive 20-08. The language included that "punishment provided within the sentencing triad of the substantive charge(s) . . . [is] sufficient to protect public safety and serve justice." (*Nazir, supra,* 79 Cal.App.5th at p. 487.) The language also included reference to section 1385 and its grant of authority to the People to seek dismissal in the interests of justice. If a trial court refused to dismiss allegations under section 1385 on the People's motion, Special Directive 20-08.1 directed deputy district attorneys to

48

seek leave of court to file an amended charging document under section 1009.[14] (*Ibid*.)

In *Nazir*, the People moved for dismissal of enhancement allegations on the basis of the arguments recited in Special Directive 20-08.1. The trial court denied the motion, asserting that the Special Directive alone was not a permissible basis for granting the motion under section 1385. The trial court then conducted a separate analysis under section 1385 and *Williams, supra,* 17 Cal.4th 148, and concluded that dismissal of the allegations was not in the interests of justice. (*Nazir, supra*, 79 Cal.App.5th at pp. 487–488.)

The reviewing court held that "section 1385 does not preclude a trial court from considering a district attorney's policy in ruling on a motion to dismiss a firearm enhancement under section 12022.5 or 12022.53 in furtherance of justice. [Citations.]" (*Nazir, supra,* 79 Cal.App.5th at p. 489.) The court further determined that the trial court had misunderstood the scope of its discretion in refusing to consider the District Attorney's Special Directive on the People's motion to dismiss under section 1385, and that Special Directive 20-08 included research related to reduction in crime and recidivism, which "are objectives of the criminal justice system a court may consider in determining whether to impose a firearm enhancement . . . and thus are

---

[14]     Special Directive 20-08 was further clarified on December 18, 2020, by Special Directive 20-08.2, which allowed deputy district attorneys to allege prior strikes and sentence enhancements in certain cases, including "where 'the type of weapon or manner in which a deadly or dangerous weapon including firearms [was] used exhibited an extreme and immediate threat to human life.' " (See *The Assn. of Deputy District Attorneys etc. v. Gascón* (2022) 79 Cal.App.5th 503, 517–518, rev. granted Aug. 31, 2022, S275478.)

relevant to determining whether to dismiss an enhancement. [Citation]." (*Id.* at p. 497.)

The *Nazir* court further held that such consideration when the People move to dismiss did not offend the separation of powers and was not inconsistent with the principles of *Williams*; nor was it inconsistent with legislative amendments made to sections 12022.5 and 12022.53 to give courts the ability to dismiss an enhancement in the interests of justice. (*Nazir, supra,* 79 Cal.App.5th at pp. 498–499.) But the *Nazir* court rejected the People's argument that a trial court need not consider, in addition to the Special Directive, whether on the facts of a particular case, dismissal furthers the interests of justice under section 1385, and directed the trial court on remand to "consider Special Directive 20-08 in determining whether to dismiss the firearm [enhancements]" and to also consider amendments to section 1385 that had become operative in the interim. (*Id.* at pp. 501–502.)

Thus, *Nazir* held that *Williams* did not preclude the trial court from relying on the District Attorney's Special Directive 20-08 when considering a motion to dismiss by the People under section 1385, but the court still had to make a case-by-case assessment as to whether dismissal in a particular case was in the interests of justice. If not, the motion may be denied notwithstanding the Special Directive. (*Nazir, supra*, 79 Cal.App.5th at p. 501.) This holding is inapplicable here because in this case, the prosecutor did *not* move to dismiss the firearm enhancement allegation, whether under the Special Directive or section 1385. And nothing in *Nazir* required the trial

50

court to dismiss the firearm enhancements prosecuted against Rodriguez.

Rodriguez's argument below and on appeal appears not to rely directly on *Nazir* but to instead be rooted in the claim that it is inequitable to deprive him of the benefits of the Special Directive of the (now former) District Attorney when other defendants were afforded that relief, so the trial court's disregard of the policy in its sentencing determinations somehow constituted error and a violation of equal protection. It does not appear that with respect to this issue, Rodriguez is claiming that the trial court misunderstood its sentencing discretion.

Although Rodriguez cites cases and established legal principles concerning equal protection (e.g., *People v. Brown* (2012) 54 Cal.4th 314, 328; *People v. Morales* (2016) 63 Cal.4th 399, 408), he does not develop his claim within the parameters of that law, by, for example, providing a showing that he is actually similarly situated to others who received the benefit of Special Directive 20-08, yet was treated unequally and the disparate treatment is unjustified under the applicable standard of review.

And, in any event, we see no equal protection violation in the trial court's denial of Rodriguez's request to dismiss all firearm enhancements based on Special Directive 20-08, which was one district attorney's discretionary policy that was subject to change, and in fact did change to permit the prosecution of enhancements based on specified criteria.

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


WILLIAMS, J.[*]


I concur:




KIM (D.), J.

---

[*]      Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

The People v. David Rodriguez
B332409


BAKER, Acting P. J., Concurring


I join the opinion for the court with one reservation.  I agree defendant and appellant has forfeited the contention that the trial court erred in imposing a middle-term sentence for his assault conviction, and I do not join the related discussion concluding the trial court did not err in any event.


BAKER, Acting P. J.

1